# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

## PACER Cover Sheet
## for Electronically Filed Documents

Any data shown here are current as of 06/10/06 . Any element of information on this form, except the received date, is subject to change as changes may be made to the Court's official docket.

**Case Title:**    Eldon W. Grace, et al. v. MRT Heavy Hauling

**Case Number:**    04-01199

| Document Information |
|---|

**Description:**    Memorandum Opinion re: [1-1] Complaint NOS 454 Recover Money/Property .

Received on:    2005-10-13 09:17:37.000

**Date Filed:**    2005-10-13 00:00:00.000

**Date Entered On Docket:**    2005-10-21 00:00:00.000

| Filer Information |
|---|

**Submitted By:**    James Burke

**If this form is attached to the document identified above, it serves as an endorsed copy of the document as it existed on the above date. To confirm that nothing has changed since then, review the docket.**

In re:
ELDON W. GRACE
DIANNA J. GRACE
     Debtor                   No. 7-04-14547 SA


ELDON W. GRACE
DIANA J. GRACE,
     Plaintiffs,


v.                             Adv. No. 04-1199 S


MRT HEAVY HAULING,
     Defendants.


**MEMORANDUM OPINION ON COMPLAINT
FOR DAMAGES AND TO COMPEL TURNOVER OF PROPERTY**

This matter is before the Court on the Complaint (doc 1) of Eldon W. Grace and Diana J. Grace ("Plaintiffs") praying that Defendant MRT Heavy Hauling ("MRT" or "Defendant") be ordered to turn over a 1998 Peterbilt Model 379 ("Peterbilt") to Plaintiffs, and seeking damages for lost monthly income and attorney's fees and costs[1]. Complaint at 1. (Doc 1)

---

[1]The complaint alleges and answer admits that this is a core proceeding under 28 U.S.C. § 157. If this case were just a turnover, the Court would agree. However, as discussed below the case was tried as a contract action, but the parties continued to treat the matter as core and have consented to treat the matter as core. It is at least a "related-to" action, so the Court has subject matter jurisdiction. See Abramowitz v. Palmer, 999 F.2d 1274, 1277 (8th Cir. 1993)(28 U.S.C. § 1334(d) grants exclusive jurisdiction to the district court over all property of the debtor and of the estate. Jurisdiction extends to exempt property.) Compare Gardner v. United States, 913 F.2d 1515, 1518 (10th Cir. 1990)(Bankruptcy jurisdiction lapses when property leaves the estate and the
                          (continued...)

Defendant opposed the requested relief and raised certain affirmative defenses, including that the contract was a lease rather than a contract for sale, that Plaintiffs had breached the lease prior to the filing of the petition, and that Plaintiffs had failed to assume the lease within sixty days of the filing of the petition as required by 11 U.S.C. § 365(d)(1). Following a trial on the merits[2], the Court finds that in effect this adversary proceeding was a contest on the character of the contract between the parties and what effect the performance or non performance of the parties had on their contractual relationship.[3] The Court concludes that the

---

[1](...continued)
controversy is between third parties only, the outcome of which is irrelevant to the estate.) This case involves a contest between the debtor and a creditor to determine the validity of claims against the Debtors' exempt property. It is therefore, in part, an action to determine validity, extent, or priority of a lien under 28 U.S.C. § 157(b)(2)(K). See Continental Nat'l Bank of Miami v. Sanchez (In re Toledo), 170 F.3d 1340, 1347 (11th Cir. 1999)(Section 157(b)(2)(K) proceedings entail lien determinations on the estate's or the debtor's property.) It is also, in part, an action affecting the adjustment of the debtor-creditor relationship under 28 U.S.C. § 157(b)(2)(O).

[2] At the conclusion of Plaintiff's case in chief, MRT moved to dismiss. The Court took the motion under advisement, and now denies the motion. The Court finds that Plaintiffs had established a prima facie case by the time they rested.

[3] Because the Court concludes that this controversy was essentially a dispute concerning the characterization of a contract and not really a turnover action, the Court is not
(continued...)

Case 04-01199-s   Doc 30   Filed 10/13/05   Entered 10/21/05 16:27:00 Page 3 of 24

contract between the parties was a contract for sale and not for lease and that MRT is estopped from asserting otherwise, and that upon delivery to MRT, in a lump sum, of the unpaid remaining monthly payments due MRT under the contract, possession of the truck and the executed title should be delivered to Plaintiffs, free and clear of any liens.

**FACTUAL BACKGROUND**

On October 31, 2001, Plaintiff Eldon W. Grace ("Grace") entered into a contract with MRT entitled "Vehicle Sublease" ("Contract"). Ex. 1. The Contract refers to Grace as both "Sublessee" (sic) and "Owner Operator". Defendant agreed to provide Grace with a vehicle (the Peterbilt), loads to haul, and compensation for hauling the loads. Grace agreed to haul MRT's loads exclusively; comply with all applicable laws; make monthly payments on the vehicle in accordance with an amortization schedule attached to, and made a part of, the Contract, Ex. 2; and provide and maintain liability insurance on the vehicle. The Contract has no provision for early

---

[3](...continued)
faced with the question of Plaintiffs' standing as chapter 7 debtors to pursue relief under § 542. The Court notes, however, that Plaintiffs claimed at least a portion of the vehicle exempt, that the trustee abandoned the Peterbilt and the related contract when she filed her no-asset report and abandonment on August 31, 2004 (doc 13 in case no. 7-04-14547), and that MRT did not object to Plaintiffs' standing to seek relief.

termination in favor of Grace, Contract, at 1 ("Terms of
Sublease"); however, Defendant is afforded the option to end
the Contract should Grace default.

At trial Grace testified that in March 2004, Grace told
Defendant that he was having financial difficulties, and
requested that the Contract be changed to lower the monthly
payment amounts.  Defendant refused, and advised Grace to
secure refinancing for the rest of the payments.  Grace
applied for refinancing at the USNM Federal Credit Union.  The
credit union approved Grace's application and contacted
Defendant for the payoff amount.  Upon discovering that the
vehicle carried a debt burden greater than its value, the
credit union declined to provide refinancing.  Unbeknownst to
Grace, Defendant had collateralized a loan with the vehicle.
Grace did not make the monthly payments required under the
Contract between May 2004 and November 1, 2004.

On June 18, 2004, Plaintiffs filed a bankruptcy petition
under Chapter 7 of the Bankruptcy Code.

According to Grace's testimony at trial, Defendant
repossessed the Peterbilt sometime between June 26, 2004 and
June 28, 2004.  At trial, Melissa Cole ("Cole"), Vice
President, MRT Heavy Hauling,  testified on behalf of
Defendant that Defendant did not receive notice of the Chapter

Case 04-01199-s   Doc 30   Filed 10/13/05   Entered 10/21/05 16:27:00 Page 5 of 24

7 filing before repossessing the Peterbilt.  Grace testified that Defendant is currently using the Peterbilt, and is earning a profit from this use.

Defendant claims that it repossessed the Peterbilt because Grace was in default of the Contract prior to filing the Chapter 7 petition.  Defendant claims that Grace was in default because he "had a suspended license and failed to make payments for maintenance and fuel charges which was a material breach under the contract." (Def.'s Resp. at 2.)  Cole testified that Grace owed forty thousand dollars for fuel, maintenance, and cash advances; she did not, however, offer any proof in support of this amount, and was vague about the precise total.  Cole further testified that Grace was also in default for failure to pay the monthly contract amounts in May 2004 and June 2004, and for failure to maintain insurance on the Peterbilt as required by the Contract.  Cole stated that Grace never purchased insurance as required; however, a moment later she stated that Grace had allowed the insurance to lapse towards the beginning of the contract period.  She also testified that the Peterbilt was covered by Defendant's insurance, and that when Grace had an accident, Defendant's insurance paid for the repairs.  Defendant's insurance had a ten thousand dollar deductible, which Defendant charged Grace.

Page -5-

Cole testified that Defendant notified Grace of the default both verbally and by letter on June 4, 2004, requesting Grace to return the Peterbilt to Defendant by June 7, 2004. Grace did not return the Peterbilt. Cole testified that Grace did not return the Peterbilt as requested because he was hiding it from Defendant by painting over the MRT Heavy Hauling logo on the Peterbilt, replacing it with "Eldon Grace Heavy Hauling", and that Grace was hauling loads that were not provided by Defendant. Cole did not state whether Defendant knew of this activity before or after repossessing the Peterbilt.

Grace testified that his license had indeed been suspended on two occasions, once for unpaid traffic fines, and once for unpaid child support. When his license was suspended for unpaid fines, Defendant paid the fines to restore his license, and sent Grace out with a load the next day. Grace's second licence suspension was initiated by the State of Kansas for non-payment of child support. Defendant, without notifying Grace, had stopped making automatic child support payments from Grace's weekly pay in March 2004. When notified by the State of Kansas, Grace paid the arrears in child support in full, restoring his license. Grace also testified that he made partial payments towards maintenance and fuel

Case 04-01199-s    Doc 30    Filed 10/13/05    Entered 10/21/05 16:27:00 Page 7 of 24

charges; Defendant deducted money to cover such expenses from his weekly checks.

Cole testified that Defendant has a number of contracts with drivers, that each contract is different, and that Max Tafoya, her father and President of MRT Heavy Hauling ("Tafoya"), determined the type of contract each driver was offered based on the driver's intentions and any agreements he made with the drivers. Cole was not privy to the discussions between Tafoya and Grace, and thus could not testify what Tafoya's intentions or understandings were. Grace, who was part of those discussions, testified that he and Tafoya agreed that Grace had a lease-to-own contract. Because he believed that at the end of the Contract he would own the Peterbilt, Grace spent four thousand dollars personalizing the interior of the Peterbilt. The Court can also find that Defendant intended that Grace would own the Peterbilt at the end of the contract; suggesting he refinance it would otherwise not make sense.

**DISCUSSION**

I.  **Whether the Peterbilt should be turned over to Plaintiffs**

At issue is whether Defendant's repossession of the Peterbilt was in violation of the automatic stay pursuant to 11 U.S.C. § 362(a)(1). "According to the automatic stay

Case 04-01199-s    Doc 30    Filed 10/13/05    Entered 10/21/05 16:27:00 Page 8 of 24

provisions of section 362, all proceedings against a debtor are stayed upon the debtor's filing of a petition of bankruptcy. It is well established that any action taken in violation of the stay is void and without effect." <u>Ellis v. Consolidated Diesel Elec. Corp.</u>, 894 F.2d 371, 372 (10th Cir. 1990). None of the exceptions to the automatic stay apply to this case. <u>See</u> 11 U.S.C. § 362(b).

Here, Defendant repossessed the Peterbilt post-petition in violation of the automatic stay. Therefore the action is void. While Defendant argues that it did not receive notice of the bankruptcy filing until after it had repossessed the Peterbilt, and there is not evidence to the contrary, the argument is moot because "any action taken in violation of the stay is void and without effect." <u>Ellis</u>, 894 F.2d at 372. Therefore, although MRT is not liable for damages for its unknowing violation of the stay, the Peterbilt should be turned over to Plaintiffs.

## II. <u>Whether the Contract is a lease or a contract for sale</u>

The Court must next decide whether Plaintiffs may keep the Peterbilt, and if so, under what conditions. To this end, the Court next examines the status of the Contract. The determination of whether the Contract is a true lease or a disguised secured transaction is governed by state law. <u>See</u>

e.g., In re Edison Brothers Stores, Inc., 207 B.R. 801, 807

(Bankr. D. De. 1997).

Both parties have made their arguments under New
Mexico law.  The Uniform Commercial Code ('UCC'), as
adopted by New Mexico, defines lease as "a transfer
of the right to possession and use of goods for a
term in return for consideration, but a sale, or
retention or creation of a security interest is not
a lease."  A security interest is defined as "an
interest in personal property or fixtures which
secures payment or performance of an obligation."
Whether a transaction is a lease or a security
agreement is "determined by the facts of each case."
The statute . . . sets out a two-part objective test
that delineates factors which, if present, establish
that an agreement is a security agreement no matter
what the parties call it . . . . [H]ereinafter, the
objective test will be referred to as the "economic
realities test." The first prong of the economic
realities test asks whether the agreement is
terminable by the lessee during the term of the
lease . . . . If the agreement is not terminable by
the lessee during the lease term, then the first
factor of the test has been established . . . . The
part of the economic realities test meets one of the
following four factors [listed in the New Mexico
statute]:
(a) the original term of the lease is equal to or
greater than the remaining economic life of the
goods;
(b) the lessee is bound to renew the lease for the
remaining economic life of the goods or is bound to
become the owner of the goods;
(c) the lessee has an option to renew the lease for
the remaining economic life of the goods for no
additional consideration or nominal additional
consideration upon compliance with the lease
agreement; or
(d) the lessee has an option to become the owner of
the goods for no additional consideration or nominal
additional consideration upon compliance with the
lease agreement.

Page -9-

<u>In re Our Secret, Ltd.</u>, 282 B.R. 697, 702-703 (Bankr. D. N.M. 2002) (citations omitted). If the two pronged economic realities test is met, the lease is construed as a secured transaction as a matter of law. Under this objective test, the parties' intentions are moot. <u>Id</u>. at 702.

Here, the Contract meets the first prong of the economic realities test because Grace could not terminate it. Therefore, the Court must next determine whether the Contract also meets the second prong of the economic realities test by meeting any of the four factors listed in the New Mexico statute. <u>See</u> <u>In re Our Secret, Ltd.</u>, 282 B.R. at 703.

Here, only the fourth factor, (d), is applicable. Factor (a) does not apply because the Court lacks evidence to conclude with certainty whether "the original term of the lease is equal to or greater than the remaining economic life of the goods." <u>Id</u>. Indeed, the fact that Grace wants to complete payments on the Peterbilt so that he can continue to use it makes it clear that factor (a) is not applicable. Factor (b) does not apply because Grace is not "bound to renew the lease for the remaining economic life of the goods [n]or is [he] bound to become the owner of the goods." <u>Id</u>. Factor (c) does not apply because Grace does not have "an option to renew the lease for the remaining economic life of the goods

Page -10-

for no additional consideration or nominal additional consideration upon compliance with the lease agreement." Id. Factor (d) applies because, according to Grace's unrebutted testimony, he and Tafoya agreed that upon completing his obligations under the Contract, he would be the owner of the Peterbilt. The amortization schedule attached to the Contract, which is what one would expect in a purchase contract rather than a lease, and the Contract referring to him as the Owner Operator support Grace's testimony that he had a lease-to-own contract, and that at the end of the Contract term, November 1, 2004, he would own the Peterbilt for no additional consideration. And Grace's investing his own money to personalize the Peterbilt, coupled with hefty payments of $69,000 in principle and $10,569.72 in interest, attests to the consistency of Grace's conduct in treating the Contract as a sale.

MRT correctly argues that there is conflicting evidence about the nature of the Contract, both inside the Contract and elsewhere. For example, the Contract has numerous references to a "sublease", "sublessee" and "lessor". And much of the Contract is also structured as a lease. But the very purpose of the economic realities test is to see through the specific

words used to determine was the economic reality of the transaction is.

In addition, although it is true that Plaintiffs' used the term "Leaseholder: ...." in amended schedule B, all those schedules were prepared under the direction of their counsel, and Plaintiffs' should not be expected to correct their counsel's minor mischaracterizations.  More important, an overall view of the schedules shows that they treated the Contract as a purchase contract rather than a true lease. They claimed $11,000 in equity in the Peterbilt on Schedule C (out of a $40,000 value).  The statement of intention, signed June 30, 2004 and filed July 22, 2004, recites that "Debtor will retain collateral and continue to make regular payments." Doc 8.  The Peterbilt was listed as personal property in Schedule B and amended Schedule B in category 23 and not as subject to a lease or executory contract (although the Contract is clearly the latter) in schedule G.  And the debt to MRT is listed in Schedule D (secured debt), albeit still using the term "truck lease" (understandable in view of the title of the Contract, "Vehicle Sublease").

The Contract is ambiguous.  While Defendant argued that the only issues relevant to interpreting the Contract are found within the four corners of the Contract, the Supreme

Court of New Mexico "abandoned the 'plain-meaning' or 'four-corners' standard [of contract interpretation], under which ambiguity is determined by the court without consideration of any evidence outside the contract itself to explain the purposes or context of the contract . . . . Without a full examination of the circumstances surrounding the making of the agreement, ambiguity or lack thereof often cannot properly be discerned." <u>Mark V, Inc. v. Mellekas</u>, 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993). Here, the Court considers Grace's explicit testimony that he and Tafoya agreed that Grace was entering into a lease-to-own contract. Defendant did not present evidence to show that Tafoya did not agree with Grace that his contract would be a lease-to-own agreement. Cole testified that she has no knowledge of what Tafoya lead Grace to believe. "The [Adverse Inference Rule] provides that when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him." <u>Int'l. Union, United Auto., Aerospace and Agric. Implement Workers of Am. (UAW) v. Nat'l Labor Relations Bd.</u>, 459 F.2d 1329, 1336 (D.C. Cir. 1972). Here, MRT clearly had relevant evidence that it failed to produce when it did not put Tafoya on the witness stand to either refute or corroborate Grace's testimony. Therefore the

Court infers that the evidence Tafoya would have presented is unfavorable to MRT's position that the Contract is merely a lease that confers no ownership interest in Plaintiffs.

Therefore, because the Contract does meet both prongs of the economic realities test, the Court determines that the Contract is indeed a disguised security agreement.  Because the contract is not a lease, there was no obligation under 11 U.S.C. § 365(d) to assume the Contract within sixty days of the filing of the petition, even assuming Plaintiffs rather than the trustee had the standing to do so.

In addition to this economic realities test, the Court finds that because Grace relied on Tafoya's representation that the Contract was a lease-to-own agreement, the principle of equitable estoppel is applicable here.  "The party seeking enforcement of equitable estoppel must show (1) lack of knowledge of the true facts in question, and (2) detrimental reliance on the other party's conduct." Gonzales v. Pub. Employees Ret. Bd., 114 N.M. 420, 427, 839 P.2d 630, 637 (Ct. App.), cert. denied, 114 N.M. 227, 836 P.2d 1248 (1992)(citing Green v. New Mexico Human Servs. Dep't, Income Support Div., 107 N.M. 628, 629-30, 762 P.2d 915, 916-17 (Ct. App. 1988)). "In addition, the New Mexico Supreme Court has recently amplified these elements, specifying that the party seeking to

Case 04-01199-s    Doc 30    Filed 10/13/05    Entered 10/21/05 16:27:00 Page 15 of 24

assert the doctrine must also demonstrate that its reliance was reasonable." Id. (citing Taxation and Revenue Dep't. v. Bien Mur Indian Mkt. Ctr., 108 N.M. 228, 231, 770 P.2d 873, 876 (1989)).  Here, Grace did not know that MRT would assert that the contract terms would not be what Tafoya lead him to believe.  Grace's reliance was reasonable because he knew that Tafoya for MRT had made such lease-to-own contracts with other drivers, because the amortization schedule attached to and made part of the Contract was consistent with a lease-to-own agreement, and because the Contract referred to Grace as the Owner Operator.  Therefore the Court finds that Defendant is equitably estopped from asserting that the Contract is merely a lease and not a lease-to-own agreement.

**III.     Whether Plaintiffs' contract rights were lost by any events of default**

The Court next needs to determine whether Grace was in default of the Contract in order to determine whether Plaintiffs' rights, including their potential ownership interest, still exists or whether it was forfeited by a default.  Defendant argues that Grace was in default before he filed the bankruptcy petition because a) Grace did not provide the insurance on the Peterbilt as required by the Contract; b) Grace's licence was suspended; c) Grace did not pay for maintenance and fuel; d) Grace did not make the monthly

Page -15-

payments as required by the Contract; and e) Grace was hauling

loads not provided by Defendant in violation of the Contract.

The Contract has "default" and "remedies" paragraphs:

DEFAULT: Each of the following events is an "Event
of Default": (i) Lessee's failure to pay when due
any of the monthly rentals or any other amounts due
hereunder or to provide or maintain the insurance
required hereby; (ii) any of Sublessee's warranties
or representations shall be or become breached or
untrue; (iii) Sublessee shall fail, after fifteen
days notice thereof, to correct any failure in the
due performance and observance of any of the other
coventants [sic] and obligations of sublessee
hereunder; (iv) sublessee shall default under any
other agreement with Lessee.

LESSEE REMEDIES: If an event of default shall occur,
lessor shall have no further obligation to lease
vehicle to sublessee and, at the option of lessee,
all rights of sublessee hereunder and in and to the
vehicle shall forthwith terminate. Upon such
termination Sublessee agrees that Lessee may,
without notice to sublessee, either take possession
of vehicle (with or without legal process) or
require sublessee to return vehicle to lessee at
such location as lessee shall designate. Sublessee
authorizes lessee and lessee's agents to enter any
premises where the vehicle may be found for the
purpose of repossessing the vehicle.

The Court interprets these provisions to specify certain major

types of default, subparagraphs (i) and (ii), as so important

to MRT that they justify MRT's immediately ending the Contract

and repossessing the Peterbilt, according to the Lessee

Remedies provisions. Subparagraph (iv) appears to be a cross

default provision, applicable in the event that MRT and Grace

had entered into any other agreements besides the Contract.

Page -16-

Any other breaches of the Contract require a fifteen-day
notice and cure period from MRT to Grace.

**a)** **Whether not providing insurance on the Peterbilt was an
event of default**

Cole testified that because Grace did not have insurance
on the Peterbilt, Defendant's insurance covered the Peterbilt
and paid for the damages when Grace was in an accident, and
that Defendant charged Grace the ten thousand dollar
deductible for this accident.  Because Defendant took these
actions instead of holding Grace in default of the Contract
for failure to carry the requisite insurance, the Court finds
that Defendant waived the insurance requirement of the
Contract.  Therefore Grace was not in default with regard to
insurance coverage.

**b)** **Whether a suspended licence was an event of default**

Grace testified that his license had indeed been
suspended on two occasions, once for unpaid traffic fines, and
once for unpaid child support.  When the license was suspended
for unpaid fines, Defendant paid the fines to restore his
license, and sent Grace out with a load the next day.  The
Court finds that by paying the fines and sending Grace out
with a load the next day, Defendant waived its right to hold
Grace in default for this license suspension.  Exhibit 3 shows

Page -17-

that this was the only suspension on the record as of the date Defendant demanded the return of the Peterbilt.

Grace's second licence suspension was initiated by the state of Kansas for non-payment of child support.  Exhibit 3 shows this suspension took place on June 15, 2004.  Defendant, without notifying Grace, stopped making automatic child support payments from Grace's weekly pay in March 2004.  When notified by the State of Kansas, Grace paid the arrears in child support in full, restoring his license.  Because Defendant's actions contributed to this license suspension, Defendant effectively waived its right to hold Grace in default for this license suspension.  Therefore, Grace was not in default with respect to the license suspensions.

**c)** **Whether Grace paid for maintenance and fuel**

Defendant claims that Grace did not pay for maintenance and fuel.  However Grace testified that he had been making partial payments towards fuel and maintenance charges insofar as Defendant withheld money for these charges from his weekly checks.  Other than to assert that Grace did not pay, Defendant did not provide any evidence to show lack of payment.  The Court lacks evidence to determine whether Grace did or did not make these payments, and therefore finds that Grace was not in default with regard to this issue.

**d)** **Whether not making the monthly payments was an event of default**

Grace did not make payments from May 2004 until the end of the Contract term. While on the face of it this appears to be a clear event of default, circumstances indicate otherwise. On Defendant's suggestion, Grace secured approval for refinancing through the credit union in order to catch up on delinquent payments and pay off the remainder of the Contract; however, the credit union declined to go through with the refinancing because Defendant had encumbered the Peterbilt beyond what the credit union was willing to lend[4]. By taking a loan on the Peterbilt that resulted in the Peterbilt's debt burden exceeding its value, Defendant effectively refused to accept the payment Grace tendered. In other words, Grace tendered payment for the entire outstanding balance, which Defendant refused to accept. Therefore, the Court finds that Grace is not in default with respect to the monthly payments[5].

**e)** **Whether hauling loads not provided by Defendant was an event of default**

---

[4]A voluntary act which renders the obligor unable or apparently unable to perform without breach is a repudiation of the contract. Restatement (Second) of Contracts § 250 (1981).

[5]Furthermore, one party's repudiation of a duty to perform discharges the other party's remaining duties to render performance. Restatement (Second) of Contracts § 253 (1981).

Case 04-01199-s    Doc 30    Filed 10/13/05    Entered 10/21/05 16:27:00 Page 20 of 24

The evidence is clear that Grace was hauling loads that MRT had not provided him, in violation of the Contract's requirement that "Sublessee shall use the vehicle only in the conduct of Lessee's business...." It is unclear whether Defendant discovered this fact before or after it repossessed the Peterbilt. Had MRT discovered this before the repossession, the Contract bound Defendant to give Grace notice of it, allowing him fifteen days to correct the problem, since a contract breach of hauling loads for himself does not fall under subsections (i), (ii) or (iv) of the default paragraph. There is no evidence that Defendant gave such notice. Even if Defendant discovered this default after repossessing the Peterbilt, it was still bound to give Grace fifteen days to cure the problem, and it did not. And in any event, such notice would have been moot because Grace was no longer in possession of the Peterbilt, and therefore no longer in a position to cure the problem. Therefore, the Court finds that Grace was not in default with respect to this issue.

**REMAINING PAYMENTS**

At the outset of and throughout the case Plaintiffs made it clear that they considered themselves obligated to make the remaining payments and would do so to recover the Peterbilt. Grace conceded that he owed six to seven monthly

payments on the Peterbilt, and that he had stopped paying when he lost possession of the Peterbilt and MRT began using the Peterbilt for its own purposes. Cole testified that Grace owed contract payments for the months of May and June when the truck was repossessed. In addition, Grace would also have owed payments for the months of July through October, according to the Contract amortization schedule. Ex. 2. Thus, Grace is still obligated to MRT for six payments of $2,210.27 each, for a total of $13,261.62. Although Grace was not in default for failure to make the payments because MRT had made full performance impossible by encumbering the vehicle and then later by repossessing it[6], Grace has now obtained the reversal of the conditions that made it

_____

[6]"[A] firmly rooted principle of contract law [is] that, in the case of a bilateral contract for an exchange of performances, one party's repudiation of its duty to perform discharges the other party's remaining duties of performance under the contract." Gilmore v. Duderstadt, 125 N.M. 330, 336, 961 P.2d 175, 181 (Ct. App. 1998)(Citations omitted.) See also Famiglietta v. Ivie-Miller Enterprises, Inc., 126 N.M. 69, 73, 966 P.2d 777, 782 (Ct. App.), cert. denied, 126 N.M. 532, 972 P.2d 351 (1998)(If a defendant commits a material breach which remains uncured, Plaintiff is not required to perform its remaining obligations under a contract.)

Case 04-01199-s    Doc 30    Filed 10/13/05    Entered 10/21/05 16:27:00 Page 22 of 24

impossible for him to perform[7].  He therefore now owes MRT the sum of $13,261.62.

**DAMAGES**

Plaintiffs put on no evidence of any damages, and therefore the request for damages will be denied.  Under New Mexico law, attorney fees are awardable only by contract, statute or rule of court.  <u>See, e.g.</u>, <u>Aboud v. Adams</u>, 84 N.M. 683, 691-92, 507 P.2d 430, 438-39 (1973).  The Contract does not provide for attorney fees for Plaintiffs, nor have Plaintiffs cited any statutory authority or court rule.  Nor is the Court aware of any such statute or rule.  Therefore, the request for attorney fees and costs is also denied.

**CONCLUSION**

The Court finds that Defendant repossessed the Peterbilt in violation of the automatic stay; that the Contract was an agreement for sale and purchase and not merely a lease; that Defendant should be equitably estopped from asserting that the Contract was merely a lease and not a lease-to-own agreement; and that Grace was not given the contractual right to cure the curable defaults and was prevented from paying off the Peterbilt.  The Court finds that Plaintiffs owe six payments

---

[7]Specific performance is an available remedy in the case of anticipatory breach of a contract.  <u>See</u> Restatement (Second) of Contracts, § 253 cmt. b and § 359(2) (1981).

Page -22-

of $2,210.27 each to MRT, for a total of $13,261.62, to complete the Contract payment obligation. Upon tender by Plaintiffs of that amount to MRT within twenty days from the entry of this memorandum opinion and accompanying judgment, MRT shall deliver the Peterbilt to Grace free and clear of liens and in the condition it was when MRT repossessed the Peterbilt in June 2004.

A judgment reflecting this Memorandum Opinion will enter.

_Honorable James S. Starzynski_
Honorable James S. Starzynski
United States Bankruptcy Judge

I hereby certify that on October 13, 2005, a true and correct copy of the foregoing was electronically transmitted, faxed, delivered, or mailed to the listed counsel and/or parties.

Ronald E Holmes
112 Edith Blvd NE
Albuquerque, NM 87102-3524

Dianna J. Grace
03 Sais
Los Lunas, NM 87031

Eldon W. Grace
03 Sais
Los Lunas, NM 87031

_James E. Burke_