**THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO**

In re:
ELDON W. GRACE
DIANNA J. GRACE
    Debtor                   No. 7-04-14547 SA

ELDON W. GRACE
DIANNA J. GRACE,
    Plaintiffs,

v.                              Adv. No. 04-1199 S

MRT HEAVY HAULING,
    Defendants.

**MEMORANDUM OPINION ON ISSUES OF
ECONOMIC WASTE AND INTEREST**

This matter is before the Court on specific issues arising

from the damages aspect of Plaintiffs' Motion for Possession and

to Pay Funds Into Court Registry (doc 72).  A review of the

proceedings to date (excluding the rich procedural variety that

this adversary proceeding has offered) will help in explaining

the Court's ruling.[1]

_____

[1] The Court has jurisdiction over the subject matter and the
parties pursuant to 28 U.S.C. §1334.  The complaint alleges and
the answer admits that this is a core proceeding under 28 U.S.C.
§ 157.  This adversary proceeding involves a contest between the
debtor and a creditor to determine the validity of claims against
the Debtors' exempt property. Therefore in part it is (or started
out as) an action to determine validity, extent, or priority of a
lien under 28 U.S.C. § 157(b)(2)(K).  See Continental Nat'l Bank
of Miami v. Sanchez (In re Toledo), 170 F.3d 1340, 1347 (11th
Cir. 1999)(Section 157(b)(2)(K) proceedings entail lien
determinations on the estate's or the debtor's property.)  It is
also in part an action affecting the adjustment of the debtor-
creditor relationship under 28 U.S.C. § 157(b)(2)(O).  This
memorandum opinion constitutes findings of fact and conclusions

Page 1 of  26

**Procedural Background**

On June 18, 2004, Plaintiffs Eldon W. Grace and Dianna J. Grace filed a bankruptcy petition under Chapter 7 of the Bankruptcy Code. Later that month (June 27) Defendant MRT Heavy Hauling, without knowledge of the filing of the bankruptcy petition, repossessed the 1998 Peterbilt Model 379. On October 4, 2004, Plaintiffs filed a complaint (doc 1) asking that MRT be ordered to turn over the truck to Plaintiffs, and seeking damages for lost monthly income and attorney's fees and costs. Following a trial on the merits, the Court issued its Memorandum Opinion on Complaint for Damages and to Compel Turnover of Property (doc 30), a Judgment (doc 31) and an Amended Judgment (doc 32), all docketed October 21, 2005. The Amended Judgment ordered that Plaintiffs pay to MRT $13,261.62 (the remaining balance on the contract) and that "Defendant shall return the 1998 Peterbilt Model 379 in substantially the same condition less reasonable wear and tear within five (5) days of receiving payment...." On November 8, 2005, Plaintiffs tendered payment but MRT refused it. On December 2, 2005, the Court entered its Order in Aid of Enforcing Judgment (doc 45), which required among other things that

> MRT shall deliver the Peterbilt free and clear of liens and in the condition it was when MRT repossessed the Peterbilt in June 2004, reasonable wear and tear

of law as may be required by Rule 7052 F.R.B.P.

Case 04-01199-s    Doc 95    Filed 04/14/08    Entered 04/14/08 15:36:40 Page 2 of 26

excepted, together with the title, on Friday, December 8, 2005 at 9:00 am (MT), at the MRT yard, at which time and place Mr. Grace or Ms. Grace shall deliver to MRT the credit union check (in the amount of $13,261.62) endorsed over to MRT.

On December 7, 2005, the Court entered its Order on Plaintiffs' Motion to Park Vehicle And on Defendant's Motion for Determination Of Supersedeas Bond (doc 49), which provided in part that

If the truck remains in the MRT yard after 9.00 am on Friday, December 9, MRT will park it, store it, not drive or otherwise use it, protect it, insure it, and make sure it remains in the same condition it was when payment was tendered on November 8.

MRT took an appeal which was denied. District Court Order Affirming Recommendation of Magistrate Court (doc 70). On February 28, 2007, Plaintiffs filed their Motion for Possession and to Pay Funds into Court Registry (doc 72). On May 3, 2007, the Court ordered that Plaintiffs deposit the $13,261.62 into the registry of the Court and that, upon the deposit timely happening, MRT deliver title to Plaintiffs (doc 78). Plaintiffs complied on May 4, 2007 (doc 79), and MRT transferred the title in the Animas Courtroom that morning. See Stipulated Order Granting Title to Vehicle (doc 80, docketed May 11, 2007). The Court then conducted a trial on the merits concerning the damages aspect of the Motion for Possession on May 4, 11 and 18, 2007, and announced oral findings of fact and conclusions of law at a

hearing conducted on September 7, 2007 (doc 85).[2]  The Court

found that the damages owed to Plaintiffs by MRT totaled

$34,073.54, without regard to any funds in the registry of the

Court, costs and interest (if any should be awarded), and without

regard to any limitation on the award of damages based on grounds

of "economic waste" or any similar doctrine.  The Court

incorporated that ruling in its Preliminary Order on Damages in

Connection with Motion for Possession and to Pay Funds into Court

Registry (doc 86).  The Court also set a briefing schedule to

address the issues of economic waste, the status of the rulings

on "wear and tear", and post-judgment interest.  Id.  The parties

have now briefed the issues, and the matter is ready for a

ruling.

**Analysis**

As noted above, the Court has already found that to put the

Peterbilt into the condition required by this Court's order will

require $34,073.54 of parts and labor, at least as of September

7, 2007.  Additional relevant facts are that the truck was not in

"showpiece" condition, and that, contrary to the Court's and

---

[2] For ease of reference, the exhibit to the September 7,
2007 minutes is attached.  The exhibit consists of the notes that
the Court used in orally announcing its findings of fact and
conclusions of law, and constitutes an almost verbatim record of
the Court's oral ruling.  An audio recording of the Court's
ruling available from the Clerk's office.

MRT's previous impression, Plaintiffs did not contend otherwise.[3]
Rather, Plaintiffs contended that the truck was (merely) in
excellent or peak condition, and was maintained that way by Mr.
Grace. The Court accepts that testimony, and also Mr. Grace's
testimony that on the day the truck was repossessed by MRT, it
was a little dusty but otherwise in excellent condition.

Wear and Tear

In the October 21, 2005 Amended Judgment, the Court ordered
that Plaintiffs pay to MRT the remaining balance on the contract
and that "Defendant shall return the 1998 Peterbilt Model 379 in
substantially the same condition less reasonable wear and tear
within five (5) days of receiving payment...." Doc 32.
Plaintiffs timely tendered the payment on November 8, triggering
MRT's obligation to return the truck. The "same condition"

_____

[3] The Court found that Plaintiff Eldon Grace maintained the
truck as a "showpiece vehicle". Doc 85, Exhibit 1, at 2. At
least part of the basis for this finding was that Mr. Grace
testified that he wanted to show the truck at "show and shines".
Plaintiffs subsequently made clear that the finding about the
"showpiece vehicle" was erroneous, since Mr. Grace intended in
the future to prepare the truck for "show and shines".
Plaintiff's [sic] Brief Following Preliminary Order on Damages,
at 2 (doc 89); [Plaintiffs'] Responsive Brief on Measure of
Damages, at 5 (doc 90). The misunderstanding does not materially
impact the decisions already made, nor require any further
proceedings, since the testimony presented by the witnesses went
to the vehicle as it actually existed at the time of the hearing
and at the time MRT repossessed it in June 2004. There was also
ample evidence that the truck was in excellent condition; e.g.,
Mr. Grace had replaced the engine, transmission, tires, etc. in
early 2004, and the truck was kept in such immaculate condition
that Ms. Grace and her daughter were not allowed in the truck
unless they took their shoes off.

Case 04-01199-s    Doc 95    Filed 04/14/08    Entered 04/14/08 15:36:40 Page 5 of 26

referred to the condition it was in in June 2004 when MRT
repossessed the vehicle.

MRT argues that "the phrase 'reasonable wear and tear' of
the truck is the law of the case. What is open is what
constitutes reasonable wear and tear." Defendant's Brief
Following Preliminary Order on Damages at 5 (doc 87). MRT also
argues that its testimony about the current value of the truck
takes into account wear and tear and therefore Plaintiff should
not be awarded any damages beyond the approximately $22,000 which
MRT says is the value of the truck. <u>Id.</u> at 5-6. This latter
argument is addressed in notes 20 and 23 in the next subsection
which deals with economic waste.

"[W]hen a court decides upon a rule of law, that decision
should continue to govern the same issues in subsequent stages in
the same case." <u>Arizona v. California</u>, 460 U.S. 605, 618 (1983),
<u>reh. denied</u>, 462 U.S. 1146. The rule is not inflexible; "it is
not improper for a court to depart from a prior holding if
convinced that it is clearly erroneous and would work a manifest
injustice." <u>Id.</u> at 618 n. 8. (Citation omitted.) However, "it
requires a final judgment to sustain the application of the rule
of the law of the case just as it does for the kindred rule of
res judicata." <u>U. S. v. U. S. Smelting Refining & Min. Co.</u>,
339 U.S. 186, 198 (1950).

Whether technically this is an instance of the doctrine of

Case 04-01199-s   Doc 95   Filed 04/14/08   Entered 04/14/08 15:36:40 Page 6 of 26

law of the case is questionable since there has been no final judgment on damages.[4]  However, it does not make a difference, since the Court is not inclined to change its decision.  The Court finds that neither argument that MRT makes on the wear and tear issue is persuasive.

The Court has not only ruled that the notion of wear and tear should be applied, but has also applied the notion to the facts of the adversary proceeding.  The Court ruled that the additional mileage that MRT put on the truck – approximately 200,000 miles in about seventeen months – resulted in a far "older" and more used truck than when MRT took it.  The Court also ruled that the tires that were on the truck when MRT took it are long gone and MRT need not replace the tires.  MRT has received all the benefit of the "wear and tear" provision that it is entitled to.  In this instance, there is no reason to set aside that ruling.  If anything, given the surprisingly high mileage that MRT put on the truck and the testimony that the truck had been abused, the ruling is overly generous to MRT.

Economic Waste

The Court's ruling on the cost of repairs or damages[5]

---

[4] To be fair, the Court itself used that terminology in the earlier stages of this adversary proceeding.

[5] In effect the cost of repairs has been the "damages" for this adversary proceeding.  The complaint sought damages for the loss of the use of the semi-tractor but because Plaintiffs put on no evidence in support of that claim, the Court awarded none.

Case 04-01199-s   Doc 95   Filed 04/14/08   Entered 04/14/08 15:36:40 Page 7 of 26

specifically reserved for MRT the right to argue that any damages award should be limited by the economic waste doctrine. Plaintiffs' evidence and argument is that full compensation requires the payment of $34,073.54; MRT's evidence and argument is that $22,000 is the maximum that should be paid.[6] (These figures are without regard to the $13,000+ in the registry of the Court.)

Plaintiffs put on evidence only of the cost of repairs. MRT contested that proof but also presented evidence of replacement value. This was the appropriate allocation of the respective burdens of coming forward with evidence and of persuasion, 3 Dan B. Dobbs, Dobbs Law of Remedies §12.19(1) at 438 (2d ed. 1993) ("Dobbs") (addressing real property cases) (footnote omitted). Compare Rust & Martin, Inc. v. Ashby, 671 S.W.2d 4, 8 (Ct. App. Mo. 1984) (in a building construction case, "any reasonable doubt whether curing defects would cause economic waste should be resolved against the contractor guilty of the breach and that

---

Memorandum Opinion on Complaint for Damages and for Turnover of Property at 22 (doc 30); Amended Judgment at 2 (doc 32).

[6] MRT continues to argue that the Court should in effect discount any award of damages for the new parts that would go into repairing the truck. Defendant's Brief Following Preliminary Order on Damages at 6 (doc 87). How to calculate such a discount with any precision is not clear. And at any rate, requiring Plaintiffs or anyone else to hunt around for used parts that are not too new and not too used instead of simply using new parts would seem to be a perfect example of "economic waste".

Case 04-01199-s    Doc 95    Filed 04/14/08    Entered 04/14/08 15:36:40 Page 8 of 26

upon it should be put the burden of proof to show economic
waste.") with General GMC Trucks, Inc. v. Crockett, 145 Ga. App.
503, 504, 244 S.E.2d 78, 79-80 (1978) (in a vehicle repair case,
"[i]f the plaintiff relies on the cost of repairs as a measure of
damages, he must prove the cost of repairs does not exceed the
value of the vehicle before the injury.").  It makes sense to
assign the burden of proof generally to the party with the most
incentive to prove the point at issue.  In this adversary
proceeding, establishing the replacement value is similar to
proving an affirmative defense that lowers the amount of damages.

    "The remedy that is most commonly obtained for breach of a
contract is a judgment for money damages."  11 Joseph M. Perillo,
Corbin on Contracts (Rev. ed. 2005) § 55.4 at 12 ("Corbin").
"The measure of damages should be that which fully and fairly
compensates for the injuries received."  Fredenburgh v. Allied
Van Lines, Inc., 79 N.M. 593, 596, 446 P.2d 868, 871 (1968)
(damages for furniture and clothing damaged while in care of
carrier) (Citations omitted.);  Camino Real Mobile Home Park
Partnership v. Wolfe, 119 N.M. 436, 444, 891 P.2d 1190, 1198
(1995) ("The objective is to place the plaintiffs in the same
financial position, with regard to the property, as they would
have been had the property not been damaged....");  McNeill v.
Burlington Resource Oil & Gas Co., 141 N.M. 212, 221, 153 P.3d
46, 55 (Ct. App. 2006), cert. granted 141 N.M. 339, 154 P.3d 1239

Case 04-01199-s    Doc 95    Filed 04/14/08    Entered 04/14/08 15:36:40 Page 9 of 26

(2007).

But what "full compensation" means in given circumstances may not be simple.

> Even when an award of damages could be purely compensatory, principle and practicality may call for an award either larger or smaller than compensation. First, damages must always reflect the substantive policy or goal, which may require something more or less than compensation.

1 Dobbs §3.1, at 283. See, for example, Fredenburgh, 79 N.M. at 596-97, 446 P.2d at 871-72 (measure of damages is either lesser of difference between "before" and "after" value of damaged property or cost of repairs); UJI-13-1816.

One of the substantive policies that drives compensation awards is the doctrine of economic waste.[7] A well tailored working definition of the term is in Hubbard v. Albuquerque Truck Center, Ltd., 125 N.M. 153, 958 P.2d 111 (Ct. App. 1998), in which the court ruled that plaintiff's damages were limited to the lower cost of substituting another engine rather than repairing the damaged engine of a tractor-trailer:

> ATC's argument boils down to an assertion that paying Hubbard his substitution cost is economically wasteful because requiring it to pay more than the tractor is worth would impose a cost on ATC which would not produce a corresponding benefit to Hubbard.

Id., 125 N.M. at 156, 958 P.2d at 114. The Hubbard court then

---

[7] The doctrine has also been described as "relative economic benefit". Peevyhouse v. Garland Coal & Mining Co., 382 P.2d 109, 113 (Okl. 1962), cert. denied 375 U.S. 906 (1963).

Page 10 of 26

elaborated on the principle:

> Very difficult remedial decisions must be made when two
> or more remedies will each provide appropriate redress
> of the plaintiff's entitlement but one of them will
> entail onerous costs to the defendant or economic
> waste.  In general we wish to fully redress the
> plaintiff's rights, but at the same time we wish to
> count the costs.  Remedies that cost more than the
> benefits they produce are suspect.

Id., citing 1 Dobbs § 1.7, at 33.  Similarly, in a real property

damage case, the New Mexico Court of Appeals stated that

> if the cost of repair is greater than the diminution in
> value, the plaintiff will only receive the latter.
> This rule makes sense given the purpose of awarding
> damages, which is to fully compensate a plaintiff, or
> restore plaintiff to his rightful position.  Allowing a
> recovery that is greater than the value of a
> plaintiff's loss would put the plaintiff in a better
> position than he or she had been in before the injury,
> which is never the purpose of compensatory damages.

McNeill, 141 N.M. at 220-21, 153 P.3d at 54-55, citing Camino

Real Mobile Home Park Partnership, 119 N.M. at 444, 891 P.2d at

1198.[8]

But the requirement to apply the economic waste doctrine "is

not rigid or inflexible".  McNeill, 141 N.M. at 221, 153 P.3d at

55.  "Where subordinate rules for the measure of damages run

counter to the paramount rule of fair and just compensation, the

former must yield to the principle underlying all such rules."

Rutherford v. James, 33 N.M. 440, 443, 270 P. 794, 796 (1928),

_____

[8] Although the rules applicable to damage to real property
are not directly applicable to personal property cases, the
general principles are close enough to provide useful guidance.
Hubbard, 125 N.M. at 158, 958 P.2d at 116.

Case 04-01199-s   Doc 95   Filed 04/14/08   Entered 04/14/08 15:36:40 Page 11 of 26

overruled on other grounds by Reed v. Styron, 69 N.M. 262, 365
P.2d 912 (1961) (household furnishings and clothing damaged in
apartment fire valued at cost rather than second-hand value).
(Citation omitted.) A further brief review of the leading
national and New Mexico case law on economic waste provides
guidance in making the decision in this adversary proceeding.

A factually black and white case[9] of economic waste appears
in Jacob & Youngs v. Kent, 230 N.Y. 239, 129 N.E. 889 (1921). In
Kent, the builder had contracted to build a country house for
upwards of $77,000 and, as part of the contract, to install pipe
manufactured by Reading. Inadvertently the builder installed
pipe manufactured by Cohoes and others instead. Other than the
specific manufacturer, the pipe was identical in all aspects to
the Reading pipe. The mistake was discovered only when the
construction was largely complete, so that the cost of
substituting the pipe was considerable.[10] The value of the house
as constructed was the same as if Reading pipe had been
installed. In these circumstances the New York Court of Appeals

---

[9] "Black and white" is this Court's characterization of the
factual predicate of the case. To be clear, all three national
cases cited in this part were split decisions decided by one vote
margins.

[10] "Some of the exposed sections might perhaps have been
replaced at moderate expense. The defendant did not limit his
demand to them, but treated the plumbing as a unit to be
corrected from cellar to roof." Id., 230 N.Y. at 244, 129 N.E.
at 891.

Case 04-01199-s   Doc 95   Filed 04/14/08   Entered 04/14/08 15:36:40 Page 12 of 26

ruled that the owner was entitled only to nominal damages.

> In the circumstances of this case, we think the measure
> of the allowance is not the cost of replacement, which
> would be great, but the difference in value, which
> would be either nominal or nothing.

Id., 230 N.Y. at 244, 129 N.E. at 891.  See also Peevyhouse

(strip miner contracted to mine farmland and restore it; after

mining, miner refused to restore land at a cost of $29,000;

owner's recovery limited to $300 as depreciated value of

unrestored land)[11]; compare Groves v. John Wunder Co., 205 Minn.

163, 286 N.W. 235 (1939) (gravel lease required lessee to return

land at substantially the same grade; lessee deliberately

breached that obligation which would have cost $60,000 versus the

depreciated value of the land at $12,000; judgment awarded for

full cost of restoring land to substantially the same grade).[12]

----

[11] "We therefore hold that where, in a coal mining lease,
lessee agrees to perform certain remedial work on the premises
concerned at the end of the lease period, and thereafter the
contract is fully performed by both parties except that the
remedial work is not done, the measure of damages in an action by
lessor against lessee for damages for breach of contract is
ordinarily the reasonable cost of performance of the work;
however, where the contract provision breached was merely
incidental to the main purpose in view, and where the economic
benefit which would result to lessor by full performance of the
work is grossly disproportionate to the cost of performance, the
damages which lessor may recover are limited to the diminution in
value resulting to the premises because of the non-performance."
Id. at 114.

[12] New Mexico cases (purport to) align with Kent and
Peevyhouse. E.g., Montgomery v. Karavas, 45 N.M. 287, 114 P.2d
776 (1941) (no economic waste to require floor and stairway of
hotel to be reconstructed, citing Kent); Camino Real Mobile Home
Park, 119 N.M. at 444, 891 P.2d at 1198 ("the measure of damages

While the seminal national cases all deal with real property, in New Mexico the economic waste doctrine (or at least some variant of the different ways to measure damages) is also applied to personal property.  E.g., UJI 13-1813 to 13-1816; Rutherford v. James; Curtis v. Schwartzman Packing Co., 61 N.M. 305, 299 P.2d 776 (1956) (compensation for damaged car to be diminution in value unless car was repairable and repair value was less); Fredenburgh v. Allied Van Lines, Inc.; Hale v. Basin Motor Co., 110 N.M. 314, 319, 795 P.2d 1006, 1011 (1990) (proper measure of damages was repair cost of vehicle rather than higher figure of difference between before and after values); Hubbard.

Several principles applicable to the circumstances of this adversary proceeding stand out from these decisions and the UJI's.  First, the general rubric is that the damaged party is to be fully and fairly compensated for the loss or injury received, e.g., Fredenburgh, 79 N.M. at 596, 446 P.2d at 871, but it is never the purpose of compensatory damages to put the plaintiff in a better position than he or she had been in before the injury.

where the plaintiff seeks to enforce a warranty as to the condition or quality of construction of real property is the cost of repairs required to bring the property into compliance with the warranty or, if the cost of repairs or replacement involves economic waste, the measure is the difference between the reasonable market value of the subject property as warranted and its reasonable market value in its actual condition", citing Kent); McNeill 141 N.M. at 221, 153 P.3d at 55 (measure of damages for temporary injury to real property for failure to remediate contamination is lesser of diminution of value or cost of remediation).

Case 04-01199-s   Doc 95   Filed 04/14/08   Entered 04/14/08 15:36:40 Page 14 of 26

McNeill, 141 N.M. at 221, 153 P.3d at 55.

Second, what constitutes "full and fair" compensation is about as bright line a test as the injunction to "do no evil". In consequence, each case devolves into a discussion (or at least evidence presented at trial) about differing ways of valuing the losses. Compare Fredenburgh (clothing and household furnishings valued at more than secondhand market) with Hubbard (semi-tractor engine valued at cost of replacing it with another used engine).

Third, "full and fair" compensation usually means plaintiff gets the smaller amount of damages. E.g., Rutherford; Curtis; Fredenburgh; Hale; Hubbard; see also Camino Real Mobile Homes Park; McNeill; UJI 13-1816, which summarizes New Mexico case law and provides as follows:

> In determining property damages, you may award only the
> smaller of two figures which are calculated as follows:
> One figure is the reasonable expense of necessary
>     repairs to the property; and
> The other figure is the difference between the fair
>     market value of the property immediately before
>     the occurrence and the fair market value of the
>     unrepaired property immediately after the
>     occurrence.

Fourth, as the UJI makes clear, ordinarily the issue is the difference between the before and after value of the property versus the cost of repairing the property. In Hubbard, for example, the court, instead of awarding the higher figure of what it would take to repair the engine, awarded a figure comprised of the market value of the truck less its salvage value. Id., 125

Case 04-01199-s   Doc 95   Filed 04/14/08   Entered 04/14/08 15:36:40 Page 15 of 26

N.M at 155, 958 P.2d at 113.[13]  Here MRT has tendered a single figure of $22,000 as an alternative to the cost of repairs.

Fifth, economic waste becomes an issue when it is "unreasonable".[14]  E.g., Kent (no difference in value of house as completed versus the cost of replacing the pipe from cellar to roof); Peevyhouse ($300 versus $29,000); Groves ($12,000 versus $60,000); Hubbard ($7,500 versus $10,000 - $12,000); see 11 Corbin §60.2 ("Unreasonable Economic Waste to be Avoided").

Sixth, even aside from considerations of unreasonable economic waste, there are other instances in which the lower figure is not the appropriate award.  E.g., Rutherford (value to owner of clothing and household goods damaged by fire cannot be fairly measured by their value as secondhand goods on the market); Fredenburgh, 79 N.M at 598, 446 P.2d at 873 ("household goods are often more valuable as a matter of fact to the owner of them than their market value as secondhand goods would show", citing Rutherford); Hubbard, 125 N.M. at 157, 958 P.2d at 115 (smaller figure to be awarded "unless there are circumstances making this measure so inadequate as to make it unreasonable.");

---

[13] There was a further deduction from a damages contribution from a third party, but that is irrelevant for purposes of this analysis.

[14] "Unreasonableness" is hardly a bright line test either. But that determination can be made easily enough if the facts of the case fall on either end of the spectrum as is the situation here.

Case 04-01199-s   Doc 95   Filed 04/14/08   Entered 04/14/08 15:36:40 Page 16 of 26

<u>McNeill</u>, 141 N.M. at 221, 153 P.3d at 55 ("unusual or exceptional circumstances" may justify award of cost of repairs which exceeds amount of diminution of value of property but not so ruling in this case).

Several bases may justify the award of the higher amount of damages. For example, <u>Rutherford</u> and <u>Fredenburgh</u> appear to recognize that clothing and furniture are in a practical sense much more valuable to their owner than any "fair market value" test might show, a fact long recognized by small loan companies who take liens on furniture and electronic goods not because those items have a high resale value but because their loss will be keenly felt by a defaulting consumer.[15] Similarly, the particular property in question may have somewhat different characteristics from other such properties. "Substitution of equivalents may not have the same significance in fields of art on the one side and in those of mere utility on the other." <u>Kent</u>, 230 N.Y. at 243, 129 N.E. at 891.

Another basis for the higher award lies beyond property values as such, going to the parties' behavior and notions of wrongdoing and deterrence and upholding a policy of requiring

---

[15] The same argument might be made concerning vehicles and title loan companies, given the enormous importance of individual vehicles for conducting life and the resources – time, opportunity, liquidity – needed to obtain a replacement vehicle. <u>But see</u> <u>Curtis</u>, 61 N.M at 308-09, 299 P.2d at 778-780 ("Blue Book" held to be exception to hearsay rule and plaintiff properly relied on it for his measure of property damages).

parties to abide by their promises.

> Defendant's breach of contract was wilful. There was nothing of good faith about it. Hence, that the decision below handsomely rewards bad faith and deliberate breach of contract is obvious. That is not allowable.

Groves, 205 Minn. at 165, 286 N.W. at 236.  The Court is not here suggesting an award of punitive or semi-punitive damages, see generally 3 Dobbs §12.5(2) (Punitive Damages for Breach of Contract), especially since Plaintiffs have not asked for such an award.  Nor is the Court considering the "efficient breach" theory of contract law.

> The theory of efficient breach holds that if a party breaches, and is still better off after paying damages to compensate the victim of the breach, the result is pareto superior, that is, considered as a unit, the parties are better off because of the breach and the breach makes no party worse off.  Consequently, according to the theory, the party who will benefit from the breach should breach.

11 Corbin, §55.15 at 78.  (Footnotes omitted.)  At least part of the reason for not doing so is because MRT has not argued that theory, and probably wisely so.[16]

_____

[16] After exposing the simplistic assumptions of the efficient breach theory, id. at 79, the author goes on to say,
> Healthy business relationships help the market function efficiently and encourage market activity.  Such relationships are almost always disrupted by a breach, whether it is efficient or otherwise.  Of course, if a party can get a better deal elsewhere, there is no harm in asking the other party to accept a sum of money in substitution for performance; to talk is not to breach.  However, if efficient breaches are encouraged, what effect does such encouragement have on trust among actors in the market?  Efficient breach theory

Page 18 of  26

MRT's valuation evidence centered on the testimony and the written appraisal of Johnny Sierra of Rush Truck Center.[17]  MRT exhibit 45 (Rush Truck Center Used Truck Appraisal).  Mr. Sierra, using the same software as Mr. Gutierrez (which appears to be an industry standard), provided testimony in support of the proposition that the cost of repairs would be the higher number. He testified that the truck <u>as it was</u> on October 19, 2005 (the date of the appraisal) had a wholesale value of $22,000.  He also testified that recently he had taken in trade a 1999 Peterbilt

---

encourages "breach first, talk afterwards."  How would the market appraise the negative drag of law-inspired distrust?  There are many reasons why contracts are enforced.  Economic efficiency is only one of them. The business community rejects efficient breach theory as a justification for willful breaches; the courts should also.

<u>Id.</u> at 79-80.  (Footnotes omitted.)

[17] In the Court's previous oral ruling on September 7, 2007, it discounted Mr. Sierra's testimony because he was too closely tied to Mr. Tafoya.  Page 5.  The Court has subsequently reconsidered that decision, and reviewed all of Mr. Sierra's testimony again.  It has concluded that his testimony should not be so quickly discounted.  This is not to say the Court agrees with everything Mr. Sierra said; indeed, the Court still believes that Mr. Gutierrez more correctly estimated the cost of repairing the truck.  For example, Mr. Sierra was qualified as an expert on the cost of parts but not on what the cost of labor would be. However, the Court does find that, as was the case with Messrs Waldo, Gutierrez, Armijo, and Garcia, Mr. Sierra answered questions on direct and cross equally carefully and thoughtfully, and appeared to be doing his best to be honest and helpful. Despite the fact that Mr. Sierra has known Mr. Tafoya since the 1970's, has sold Mr. Tafoya about eight trucks, and anticipates Mr. Tafoya coming back to purchase more trucks from him, Mr. Sierra was a credible witness who did not appear particularly biased toward MRT or against Plaintiffs.

Case 04-01199-s    Doc 95    Filed 04/14/08    Entered 04/14/08 15:36:40 Page 19 of 26

(the truck at issue is a 1998 model) for $18,000, although the 1999 Peterbilt was a different model and differed from the 1998 Peterbilt in other ways, including a shorter hood.  On cross examination Mr. Sierra testified that after service department inspection and detailing, the retail value of the 1999 Peterbilt would be about $27,000.

The witness was not asked what the retail value of the 1998 Peterbilt was as of October or November 2005.  However, from Mr. Sierra's testimony it appears clear that the 1999 Peterbilt was a "cheaper" model than the 1998 Peterbilt, even if Mr. Sierra did not say this directly.  The arithmetic of the testimony about the cheaper model was that it had a "mark up" of 50% in value going from wholesale to retail.  Extrapolating from this figure, the retail value of the 1998 Peterbilt in October or November 2005 would have been about $33,000.

To begin with, there is a fundamental flaw with MRT's evidence and the way MRT is using it.  What MRT showed was the value of the truck as is, which had been damaged, abused and subjected to very high usage as shown by the high mileage.  MRT did not present evidence of what the value would be of a reasonably well maintained 1998 Peterbilt 379 with 607,000 miles as of June 2004 but with seventeen months of reasonable wear and tear on it.  Compare Hubbard, 125 N.M. at 158, 958 P.2d at 116 ("other vehicles of similar age and service [worth] $11,000.").

Case 04-01199-s   Doc 95   Filed 04/14/08   Entered 04/14/08 15:36:40 Page 20 of 26

==MRT's evidence of replacement value fails.==

But even accepting the evidence for the reason that MRT presented it, the evidence does not suffice. MRT exhibit 45 and the $33,000 figure are significant in several ways. First, the operative date at which the truck was to be turned over to Plaintiffs was in October 2005 (the month the appraisal is dated) or November 2005, not May 2007 (the month of Mr. Sierra's testimony). So the operative date for any valuation is late 2005 rather than a year and half later.

> The conventional "measurement" [of damages for breach of a contract] is the difference between the contract price and the market price on the date for performance.

1 Dobbs §3.1 at 285. (Emphasis in original.)

Second, given the particular circumstances of this adversary proceeding, the calculations that were needed were (a) the value, in October 2005, of a 1998 Peterbilt 379 in excellent condition with 607,000 miles on it but less seventeen months worth of reasonable wear and tear (which would be less than 200,000 additional miles) and (b) the value of the truck as it was in October 2005 (which is what Mr. Sierra's $22,000 estimate was). The difference between these two figures would then be compared to the cost of repair to see which would be higher.

Third, the purpose of a damages award is to fully compensate the injured party. If Plaintiffs were going to obtain another

vehicle, they would have to pay retail.[18]  Thus the Court should

use the $33,000 figure.[19]

Fourth, and most obvious, the economic waste damages figure

is remarkably close to Plaintiffs' figure of $34,073.54  for

repairs.  That the difference is so small suggests that the

larger figure is not unreasonable, and therefore the Court need

not address the issue of economic waste any further.  However,

because the parties have argued the issue, the Court will

_____

[18] The determination that the replacement value should be
the retail value means that MRT had the burden of coming forward
with evidence of what the retail value was.  The Court has worked
out what that value was from the evidence of wholesale value
presented by MRT.  However, if the Court has inferred too much
from the evidence presented, then the conclusion must be that MRT
has failed to carry its burden to come forward with any evidence
of the retail value, and therefore has presented no evidence for
replacement value.

[19] The underlying chapter 7 case was filed prior to the
effective date of any analogous provisions of the Bankruptcy
Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No.
109-08, 119 Stat. 23 ("BAPCPA"), and therefore the changes
enacted by that legislation are not applicable to this adversary
proceeding.  Nevertheless, using the retail value of the truck is
consistent with Congress' intent to require debtors to use
"replacement value" of any property which they intend to keep or
use.  See, e.g., §506(a)(2) (as amended by BAPCPA):
      If the debtor is an individual in a case under chapter
      7 or 13, such value with respect to personal property
      securing an allowed claim shall be determined based on
      the replacement value of such property as of the date
      of the filing of the petition without deduction for
      costs of sale or marketing. With respect to property
      acquired for personal, family, or household purposes,
      replacement value shall mean the price a retail
      merchant would charge for property of that kind
      considering the age and condition of the property at
      the time value is determined.

complete its analysis.[20]

To (much less elegantly) restate what Mr. Justice Cardozo said in <u>Kent</u> (quoted above), items considered for their mere utility or that are completely fungible are more susceptible to an economic waste analysis than those with some "art" involved. In this case there is no question that Plaintiff had customized or "arted up" (note: <u>not</u> "tarted up") the truck, so that it was not completely comparable to just any other 1998 Peterbilt 379. This truck went beyond the merely utilitarian.  In <u>Hubbard</u>, on the other hand, there was no suggestion that the damaged engine was any different from any other engine of the same make.[21]

It is true that some MRT witnesses disapproved of Mr. Grace's taste while others did not.  In one sense that fact is irrelevant, since in the context of an economic waste argument, the defendant may not argue that the plaintiff's taste was so bad that plaintiff was better off with the defective performance.  11 <u>Corbin</u> §60.3 at 628-29 and cases cited therein.  On the other

───────────────

[20] MRT argued that the fair market value of the vehicle would reflect reasonable wear and tear.  Assuming that to be the case, the fact that the two numbers are so close strongly suggests that MRT is entitled to no additional deduction for wear and tear.

[21] "The record does not reveal anything unique or specialized about Hubbard's tractor.  Since Hubbard did not attach the fair market value for similar tractors established by ATC, we must assume the tractor was essentially fungible; that is, reasonably subject to replacement by any number of other vehicles of similar age and service for $11,000."  <u>Id.</u> 125 N.M. at 158, 958 P.2d at 116.

Case 04-01199-s   Doc 95   Filed 04/14/08   Entered 04/14/08 15:36:40 Page 23 of 26

hand, the testimony of the witnesses who admired the truck reinforces the notion that a really good looking truck could sell for a higher price. Although Mr. Sierra testified that the additional items that Mr. Grace added or substituted did not add "much" value to the truck[22], Mr. Grace pointed out that a good looking truck was less likely to be stopped for safety inspections. Thus it is clear that the value to Plaintiffs (and particularly Mr. Grace) attributable to the good looks of the truck was not merely sentimental or fanciful, <u>Rutherford</u>, 33 N.M. at 443, 270 P. at 795, or purely idiosyncratic. <u>Hubbard</u>, 125 N.M. at 158, 958 P.2d at 116. It was this truck that MRT took possession of and used, and therefore the "eggshell head" rule – one takes the plaintiff, or in this instance plaintiff's truck, as is – is applicable. <u>See</u> UJI 13-1802.

Finally, the Court accepts Mr. Gutierrez' testimony that the truck had been abused. Witnesses testified that MRT was known for how well maintained and how good looking its trucks were; this one, when it was in use by MRT, was not. Mr. Gutierrez' testimony was reinforced by the very high mileage that MRT put on

---

[22] Without getting too semantic, the Court notes that Mr. Sierra did not say that Mr. Grace's additions added <u>no</u> value. However, even assuming his statement was intended to convey that in fact Mr. Grace's additions had added some value, Mr. Sierra did not quantify that value.

Page 24 of 26

the truck during the seventeen months it used the truck.[23]

The Court therefore finds that the appropriate measure of damages is the cost of repair, which is $34,073.54.[24]

<u>Interest</u>

Throughout this litigation, Plaintiffs have never sought an award of prejudgment interest. Similarly, MRT does not dispute that postjudgment interest must be awarded, and neither party disputes that the rate should be that set out in 28 U.S.C. §1161(a). <u>See</u> <u>Wheeler v. John Deere Co.</u>, 986 F.2d 413 (10th Cir. 1993). So the only remaining issue is when the interest on the judgment should begin to run. MRT is correct that the judgment accompanying this memorandum opinion is the one that sufficiently quantifies and fixes MRT's obligation. Although the figure of $34,073.54 has been present in this adversary proceeding since September 7, 2007, that figure was not final until today. Therefore postjudgment interest begins to run only upon the entry of the judgment today.

**Conclusion**

The proper measure of damages is the cost of repairs, which

---

[23] The high mileage was presumably reflected in Mr. Sierra's valuation of the truck, which is a further reason why the truck valuation probably does not accurately reflect normal wear and tear.

[24] Because of this ruling, Plaintiff's request to reopen the trial for further evidence of value, [Plaintiffs'] Responsive Brief on Measure of Damages, at 6 (doc 90), is denied as moot.

in any event is not unreasonably different from the replacement cost argued by MRT. The figure for cost of repairs is $34,073.54, together with interest at the federal judgment rate. MRT is entitled to no further reduction for wear and tear.

Plaintiffs are also entitled to an order releasing back to them the funds in the registry of the Court, which of course reduces the total judgment amount owed by MRT once Plaintiffs have received the registry funds. The Court will enter a separate judgment in accordance with this memorandum opinion.

James S. Starzynski
United States Bankruptcy Judge

Date Entered on Docket:  April 14, 2008

COPY TO:

Dianna J. Grace
03 Sais
Los Lunas, NM 87031

Eldon W. Grace
03 Sais
Los Lunas, NM 87031

Michael K Daniels
PO Box 1640
Albuquerque, NM 87103-1640

Ronald E Holmes
112 Edith Blvd NE
Albuquerque, NM 87102-3524